Allen, J.
 

 The defendants in error challenge the plaintiff’s capacity to bring this action, and cite
 
 Jaeger
 
 v.
 
 Topper,
 
 103 Ohio St., 350, 133 N. E., 82, as authority for their contention. That was a case arising under the Housing Code in the city of Columbus, Ohio, and in a
 
 per curiam
 
 opinion the court held that the plaintiff, who was an abutting property owner, could not sue to restrain the defendant from altering his residence, so as to make it a tenement house of four apartments, contrary to the provisions of the Housing Code, on the ground that the purpose of the Code was to make provision concerning the erection of tenement houses for the benefit of those who occupy
 
 *633
 
 them, and hot arbitrarily to confer rights upon adjoining property owners.
 

 "We see a marked distinction between the
 
 Jaeger case, supra,
 
 and the instant action. We have here an application for injunction under a zoning ordinance which zones the entire city for the benefit of the community. The benefit to be derived from the observance of these zoning regulations accrues, not only to the municipality, but to the abutting property owner. The plaintiff, therefore, as to her capacity to bring this suit, is in a position analogous to that of one for whose benefit a contract has been made by another party. Having a substantial interest in the enforcement of the zoning restrictions, she is a proper party to enforce their observance by a suit for injunction.
 

 A case directly in point from a court of last resort is that of
 
 Holzbauer et al.
 
 v.
 
 Ritter et al.,
 
 184 Wis., 35, 198 N. W., 852. In this case it was contended that an action for injunction could not be brought by adjacent property owners upon the ground that the zoning ordinance provided its own penalty for its violation. The Supreme Court of Wisconsin, however, held in the first paragraph of the syllabus:
 

 “Where erection of a storebuilding in violation of a zoning ordinance might cause special damage to property of plaintiffs not suffered by general public, they could sue to enjoin such erection in order to prevent irreparable injury.”
 

 The contention of the defendants in error as to the plaintiff’s capacity to bring the action is therefore overruled.
 

 The application for injunction is based upon the
 
 *634
 
 proposition that the contemplated apartment house, if erected in accordance with the plans and specifications, will violate the several provisions of the Cincinnati zoning ordinance relating to height, dimensions, area, and bulk of buildings within a residence C zone. None of the use regulations of the ordinance will be violated by the building contemplated. Since the answer of the defendant Messer attacks the constitutionality of the zoning ordinance the question is squarely raised whether, under the Constitution of Ohio and of the United States, a city can regulate building development and uses of property within its own boundaries according to zones or districts. The defendants in error claim that the ordinance violates Article I, Section 1, of the Constitution of Ohio, Article I, Section 19, of the Constitution of Ohio, and Article XTV, Section 1, of the Amendments to the Constitution of the United States. These provisions of the Constitution, in so far as pertinent, read as follows: -
 

 Article I, Section 1:
 

 “All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety.”
 

 Article I, Section 19:
 

 “Private property shall ever be held inviolate but subservient to the public welfare. When taken in time of war or other public exigency, imperatively requiring its immediate seizure or for the purpose of making or repairing roads, which shall be open to the public, without charge, a compensation shall
 
 *635
 
 be made to the owner, in money, and in all other cases, where private property shall be taken for public use, a compensation therefor shall first be made in money, or first secured by a deposit of money * * *.”
 

 Article XIV, Section 1:
 

 “No state shall make or enforce any la.w which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.”
 

 The sections of the zoning ordinance (Section 452-5 to Section 452-96, inclusive, Code of Ordinances), which affect this case, are the following:
 

 Section 452-20, which permits the type of structure contemplated.
 

 Section 452-30, which limits the height of the structure to 10 stories or 120 feet, and provides that the aggregate total gross floor area of all floors shall not exceed 275 per cent, of the lot area.
 

 Section 452-41, which contains a provision that the structure contemplated shall set back 30 feet from the street.
 

 Section 452-61 which contains side yard requirements.
 

 Section 335. It shall be the duty of the commissioner of buildings, engineer and the chief inspectors and deputies appointed under this Codé to enforce the terms and provisions of this Code and all other ordinances of the city and laws of the state of Ohio relating to the same subject-matter.
 

 Under the ordinance, houses of more than 10
 
 *636
 
 stories in height are prohibited within residence C district, and the dimensions of the apartment house here contemplated would have to be drastically curtailed. It is, in brief, defendants’ contention that the restrictions of the ordinance constitute a taking of private property without due compensation and without due process of law. The plaintiff in error on the contrary maintains that the ordinance is valid, upon the ground that it falls within the police power delegated to the municipality by the people in Article XVIII, Section 3, of the Constitution of Ohio, and in specific legislative enactments.
 

 Sections 4366-1 to 4366-12 of the General Code empower cities to provide for city planning commissions, upon whose recommendation the council of municipalities by ordinance may provide for the zoning or districting of municipalities and the regulation of the location, bulk, height, and uses of buildings and other structures.
 

 Section 4366-8 of the General Code reads as follows :
 

 “Whenever the city planning commission, of any municipality or any board or officer with city planning powers, whether such commission, board or officer is created under state statute or municipal charter, or the planning commission of any village appointed under the provisions of Section 4366-7, certifies to the council or other legislative body of the municipality any such plan for the districting or zoning of the municipality according to the uses of buildings and other structures and of premises, then said council or other legislative body, in the interest of the promotion of the public
 
 *637
 
 health, safety, convenience, comfort, prosperity or general welfare, may regulate and restrict the location of buildings and other structures and of premises to be used for trade, industry, residence or other specified uses, and for said purposes divide the municipality into districts of such number, shape and area as may be deemed best suited to carry out the purposes of this section. For each of such districts regulations may be imposed designating the kinds or classes of trades, industries, residences or other purposes for which buildings or other structures or premises may be permitted to be erected, altered or used subject to special regulations. ’ ’
 

 It is evident that these legislative provisions authorize the enactment of ordinances such as that involved herein. Furthermore, if such a legislative enactment had not been made, a majority of the court are of opinion that under the home rule provision of the Constitution (Article XVIII, Section 3) the regulation of the bulk, area, and use of buildings is a function of local self-government and that therefore the municipality is doubly empowered to enact legislation upon this subject, having been given such authority both by the Legislature and by the Constitution.
 

 Even if the municipality has power to zone, however, it must exercise that power so as not to violate the state and federal Constitutions. The specific question confronting us, therefore, is whether the ordinance does contravene the constitutional provisions above quoted. In other words, does the ordinance come within the police power?
 

 Under the police power society may restrict the
 
 *638
 
 use of property without making compensation therefor, if the restriction be reasonably necessary for the preservation of the public health, morals, or safety. This is so, because all property within the state is held subject to the implied condition that it will be so used as not to injure the equal right of others to the use and benefit of their own property. Ruling Case Law, Volume 6, page 198.
 

 Such restrictions cannot be placed upon the use of property for purely aesthetic reasons, although, if the public health, morals, and safety are secured by the enactment of such legislation, the fact that an aesthetic benefit incidentally results will not invalidate the exercise of the power.
 
 Haller Sign Worths
 
 v.
 
 Physical Culture Training School,
 
 249 Ill., 436, 94 N. E., 920, 34 L. R. A., (N. S.), 998, and note;
 
 Welch
 
 v.
 
 Swasey,
 
 193 Mass., 364, 79 N. E., 745, 23 L. R. A., (N. S.), 1160, 118 Am. St. Rep., 523.
 

 Now acts done in the proper exercise of the police power, which merely impair the use of property, do not constitute a taking of property for public use. 6 Ruling Case Law, p. 201;
 
 Mugler
 
 v.
 
 Kansas,
 
 123 U. S., 623, 8 S. Ct., 273, 31 L. Ed., 205.
 

 Therefore the paramount question in this case is whether the ordinance enacted was passed in the proper exercise of the police power.
 

 As a preface to our discussion of this question we must remind ourselves that the test is not whether this court, sitting as a city opuncil, would have enacted the ordinance challenged. The members of this court may or may not conceive that such an ordinance is wisely calculated to preserve
 
 *639
 
 the public health, morals or safety. If the ordinance discloses no purpose to prevent some public evil or to fill some public need, and has no real or substantial relation to public health, morals, and safety, it must be held void. When, however, legislation does have a real and substantial relation to the prevention of conditions detrimental to the public health, morals, or safety, no matter how unwise the measure itself seems to individual judges, it is not for the judicial tribunals to nullify it upon constitutional grounds.
 
 Grainger
 
 v.
 
 Douglas Park Jockey Club,
 
 148 F., 513, 78 C. C. A., 199, 8 Ann. Cas., 997;
 
 State
 
 v.
 
 Hyman,
 
 98 Md., 596, 57 A., 6, 64 L. R. A., 637, 1 Ann. Cas., 742.
 

 The courts in such cases have no right to determine whether the measures questioned are wise or the best that might have been adopted. The courts cannot hold such laws invalid upon the mere ground of inexpediency. In other words, the question of the reasonableness of this ordinance is one, in the first instance, for the determination of the council which enacted it.
 

 That the council which enacted the Cincinnati ordinance considered that there was substantial relation between the ordinance and the public health, morals, and safety, is shown by the conceded fact that it carefully considered briefs submitted prior to the passage of the zoning ordinance by the various eminent scientific bodies, representatives of the American Association of Engineers, of the American Institute of Architects, of the Council of Social Agencies, and of the Public Health Federation. In these briefs distinguished physicians, engineers, architects, and housing experts
 
 *640
 
 made deliberate statements to the effect that the zoning ordinance did have a real relationship to congestion of traffic, to fire hazard,' to the maintenance of family life, to public health, and to public safety, and it was with this evidence in mind that the council enacted the measure.
 

 It has long been held that provisions which restrict the height of buildings have a relation to the public health and safety.
 
 State
 
 v. Cunningham, 97 Ohio St., 130, 119 N. E., 361. The first paragraph of the syllabus of this case reads as follows:
 

 “Ordinances of a municipality reasonably regulating the height, mode of construction, and use of tenement houses are a proper exercise of the police power for the preservation and promotion of the safety, health and welfare of the community * * *."
 

 Such regulations do have relation to the fire hazard, which is increased by the unrestrained erection of buildings to any height desired. Moreover, the fact that the height of buildings is more restricted in residence sections of the municipality and less restricted in the business sections — in other words, that there is a variation in height regulations according to districts — does not invalidate such ordinances.
 
 Welch
 
 v.
 
 Swasey,
 
 214 U. S., 91, 107, 29 S. Ct., 567, 53 L. Ed., 923.
 

 It is more difficult to use the fire apparatus, and more difficult to save life in residence districts than in the business sections for people continually reside there by night as well as by day, and children and elderly people and the sick and infirm spend their timei there.
 

 The high buildings in business districts, constructed as they are of structural steel and of
 
 *641
 
 fire proof materials, are less dangerous from the fire hazard standpoint than residence structures, many of which are built of wood, and hence a district height classification is not unconstitutional.
 

 Similarly, restrictions as to the occupancy of lots have been upheld upon, the ground that the retention of air space has a direct relation to health.
 
 Bebb
 
 v.
 
 Jordan,
 
 111 Wash., 73, 189 P., 553, 9 A. L. R., 1035;
 
 Building Commission of City of Detroit
 
 v.
 
 Kunin,
 
 181 Mich., 604, 148 N. W., 207, Ann. Cas., 1916C, 959.
 

 The
 
 Bebb ease
 
 involved an ordinance of the city of Seattle, which required for an apartment building a court area for light and air of 1,680 square feet and a yard area in the alley of 13 feet in depth. It was held that the ordinance was not arbitrary nor unreasonable, and that the Legislature was empowered to authorize a city to enact ordinances regulating the height and character of buildings which might be erected if the regulations aimed at promoting the public health, safety, and welfare, and tended reasonably so to do.
 

 In the
 
 Detroit case
 
 an ordinance was construed which prescribed what percentage of a lot might be occupied by a tenement, and prescribed the size of the yard at the rear of the building. According to the ordinance, no tenement was permitted to cover more than 80 per cent, of a lot bounded by two or more intersecting streets, and the depth of the yard, measured in the clear from the porches to the rear line of the lot, could not be less than 15 feet in any part. It was held that, as the restrictions were for the benefit of the community
 
 *642
 
 as a whole and of the adjacent property, they were reasonable and not invalid.
 

 These holdings are justified upon the ground that the amount of air space enjoyed under both working and living conditions directly affects the existence or nonexistence of tuberculosis and other social scourges. Such laws tend directly to prevent disease.
 

 The specific subjects, therefore, in this Cincinnati ordinance, if they were identically treated in the various districts, come within the police power. The question here raised for the first time in Ohio is whether the municipal authorities may definitely divide and zone a city, planning its development, and regulating area, bulk, height, and use of buildings differently in different districts.
 

 It is urged in support of such legislation that congestion of traffic will diminish, the slum will disappear, the fire hazard will be reduced, the expense of pavement construction will be lessened, if the heavy business and factories of the city can be centered in one section and the residence life of the city in another. Plaintiff in error also claims that children and old people will have better health and be safer from injury if living in districts protected from the traffic, the noise, and the confusion of the downtown sections, and that the home will be protected from the rapid onslaught of urban life by such zoning.
 

 It is urged, upon the other hand, that the concentration of population into certain set districts, so far from eliminating the slum, will tend to distribute its evils, and that the other considera
 
 *643
 
 tions urged are purely fanciful and aesthetic; that the mere desire of certain persons to live in residence districts free from all business features and free from apartment houses does not authorize the employment of the legislative power in such a drastic form.
 

 Reverting to our original consideration, we have to remind ourselves that the question is not whether the slum will certainly be eliminated by such zoning, but whether such zoning reasonably tends toward the elimination of the slum; not whether congestion of traffic and enhanced public health and improved public morals will certainly result from the enactment of such measures, but whether there is a reasonable connection between such measures and the public health, morals, and safety.
 

 Upon mature consideration, after two exhaustive hearings given in this case, we cannot say that there is no relation between the legislation enacted and the public health, safety, and morals. It is true that the slum roots in causes deeper than the mere kind of buildings that a,re erected in slums. It is true that non-nuisance businesses might better, so far as the health of their own inhabitants is concerned, be conducted in districts where there are no apartment houses and where there is no business life. It is also true, however, that family life is promoted by the separation of families, and by their residence in districts where the open spaces, the possibility of gardening, and the freedom from the society which presses around one in a partial business and tenement district, make for health through recreation and peace of mind.
 

 The entrance of business blocks into a residence
 
 *644
 
 district tends to “blight” the district and gradually to invite therein the hazards, both physical and moral, which exist in the sections which combine business with home life.
 

 We cannot say that there is no reasonable relation between the public morals and an attempt to set off for the people of a great city ample parts of the town in which they can always maintain residence districts, unblighted by industry and by the old style of tenement. In this particular instance such tracts of this kind have been reserved as will be available for the inhabitants of Cincinnati for a hundred years to come.
 

 If a law regulating the air space which must he allowed in a tenement house has a reasonable relation to health, we cannot say that a measure which will save considerable districts for the city in which the air space is unblocked by massed building construction has no reasonable relation to health. The mere fact that the economic factor looms largest in determining the choice of a residence does not mean that restrictions which give space and air, light, and separation to houses will not eventually shape the kind of building which is done, and benefit the public health. The laws which compelled tenement houses to install plumbing and sanitary conveniences did not do away with poverty, but they did compel builders in future building to conform to certain health standards. We cannot assume that similar results will not occur from regulations such as these embodied in this zoning ordinance.
 

 Furthermore, we cannot say that, the council did not look forward to a time when by the natural
 
 *645
 
 ^functioning of the law of supply and demand the tide of population would turn in the direction where light, air space, and health can be secured as normal living conditions, and where by these restrictions .and by public demand the builders would be compelled to build homes which would make for the maintenance rather than for the deterioration of the American family.
 

 ,. This problem must be viewed from the standpoint of coming generations. Regarded from the limited outlook of the immediate present, it is easy to claim with some degree of cogency that there is no relation between these measures and the public health, safety, or morals. Taking a long view into the future, however, and looking back into the past, to remind ourselves what detriment the unrestricted congestion in city life, both of traffic and housing, has already done the public welfare, we do see a real relation between the substantial material welfare of the community and this effort of the city to plan its physical life.
 

 These conclusions have been upheld in the majority of cases decided in state courts of last resort dealing with zoning in the United States. They are as follows:
 
 Lincoln Trust Co.
 
 v.
 
 Williams Bldg. Corporation,
 
 229 N. Y., 313, 128 N. E., 209;
 
 Palmer
 
 v.
 
 Mann,
 
 120 Misc. Rep., 396, 198 N. Y. S., 548; Id., 206 App. Div., 484, 201 N. Y. S., 526;
 
 Ware
 
 v.
 
 City of Wichita,
 
 113 Kans., 153, 214 P., 99;
 
 State ex rel. Civello
 
 v.
 
 New Orleans
 
 (and other cases of the same group) 154 La., 271-295, 97 So., 440, 445, 446, 33 A. L. R., 260;
 
 Boland
 
 v.
 
 Compagno,
 
 154 La., 469, 97 So., 661;
 
 Ex parte Quong Wo,
 
 161 Cal., 220, 118 P., 714;
 
 Brown
 
 v.
 
 City of
 
 
 *646
 

 Los Angeles,
 
 183 Cal., 783, 192. P., 716;
 
 Ex Parte Hadackeck,
 
 165 Cal., 416, 132 P., 584, L. R. A., 1916B, 1248, affirmed under name
 
 Hadackeck
 
 v.
 
 Sebastian, 239
 
 U. S., 394, 36 S. Ct., 143, 60 L. Ed., 348, Ann. Cas., 1917B, 927;
 
 State ex rel. Carter
 
 v.
 
 Harder,
 
 Bldg.
 
 Inspector of Milwaukee
 
 (1923), 182 Wis., 148, 196 N. W., 451, 33 A. L. R., 269;
 
 Holzbauer
 
 v.
 
 Ritter,
 
 184 Wis., 35, 198 N. W., 852 (1924);
 
 State ex rel. Morris
 
 v.
 
 Osborn,
 
 22 Ohio N. P., (N. S.), 549, 31 Ohio Dec., 98, 197;
 
 Opinion of Justices,
 
 234 Mass., 597, 127 N. E., 525;
 
 Building Inspector of Lowell
 
 v.
 
 Stoklosa
 
 (Mass.), 145 N. E., 265;
 
 Brett
 
 v.
 
 Building Commr. of Brookline (Mass. 1924),
 
 145 N. E., 269;
 
 Sckait
 
 v.
 
 Senior,
 
 97 N. J. Law, 390, 117 A., 517;
 
 Cliffside Park Co.
 
 v.
 
 Cliffside,
 
 96 N. J. Law, 278, 114 A., 797;
 
 Coken
 
 v.
 
 Rosevale Realty Co.,
 
 206 App. Div., 681, 199 N. Y. S., 916;
 
 Cherry
 
 v.
 
 Isbister,
 
 234 N. Y., 607, 138 N. E., 465.
 

 One of the most instructive cases upon this question is the
 
 Opinion of the Justices
 
 to be found in Volume 234 of the Massachusetts Reports, at page 597. In this case the opinion of the Justices had been asked by the Massachusetts House of Representatives, upon the question as to whether a statute, providing that a city or town may by ordinance or by-law restrict to specified parts of the municipality buildings to be used for particular industries, trades, manufacturing or commercial purposes, or may exclude them from specified parts, or may provide that such buildings situated in certain parts of the municipality shall be subject to special regulations as to their construction or use, and that certain kinds of dwelling houses and
 
 *647
 
 tenement houses shall be restricted to parts of the municipality or shall be excluded from specified parts, would be constitutional within the provisions of the Massachusetts Constitution and within the provisions of the Constitution of the United States. The Supreme Judicial Court of Massachusetts held that no provision of the state or federal Constitution would be contravened by such a statute, and later, after such statute had been enacted, and its constitutionality was questioned, reaffirmed its first holding.
 
 Bldg. Inspector of Lowell
 
 v.
 
 Stoklosa
 
 (Mass.), 145 N. E., 262.
 

 The court, upon page 611 of the opinion (234 Mass., 64, 127 N. E., 531), says:
 

 “In the light of these principles declared by the Supreme Court of the United States, illumined by instances of their specific application, we are of opinion that the proposed statute cannot be pronounced on its face contrary to any of the provisions of the federal Constitution or its amendments. The segregation of manufacturing, commercial, and mercantile business of various kinds to particular localities, when exercised with reason, may be thought to bear a rational relation to the health and safety of the community. We do not think it can be said that circumstances do not exist in connection with the ordinary operation of such kinds of business which increase the risk of fire, and which render life less secure to those living in homes in close proximity. Health and security from injury of children and the old and feeble and otherwise less robust portion of the public well may be thought to be promoted by requiring that dwelling houses be separated from
 
 *648
 
 the territory devoted to trade and industry. The suppression and prevention of disorder, the ex-tinguishment of fires, and the enforcement of regulations for street traffic, and other ordinances designed rightly to promote the general welfare, may he facilitated by the establishment of zones or districts for business as distinguished from residence. Conversely, the actual health and safety of the Community may be aided by excluding from areas devoted to residence the confusion and danger of fire, contagion, and disorder which in greater or less degree attach to the location of stores, shops, and factories. Regular and efficient transportation of the bread-winners to and from places of labor may be expedited. Construction and repair of streets may be rendered easier and less expensive if heavy traffic is confined to specified streets by the business there carried on. It is easy to imagine ordinances enacted under the assumed authority of the proposed act which would exceed the constitutional limits of the police power and be an indefensible invasion of private rights. But it cannot be presumed in advance that municipalities will go outside their just powers and unwarrantably interfere with property. Oases of that sort must be dealt with if and when they arise.”
 

 A number of other important jurisdictions in the United States have sustained the validity of such zoning ordinances. The Supreme Court of New Jersey, in the case of
 
 Schait
 
 v. Senior,
 
 Bldg. Inspector,
 
 97 N. J. Law, 390, 117 A., 517, held that a statute which authorized a town in the exercise
 
 *649
 
 of its police power to enact zoning ordinances was constitutional.
 

 The Supreme Court of Wisconsin, in the case of
 
 State ex rel. Carter
 
 v.
 
 Harper, Inspector of Bldgs.,
 
 182 Wis., 148, 196 N. W., 451, held the zoning ordinance of the city of Milwaukee constitutional. This zoning ordinance established within the city of Milwaukee four classes of use districts: Residence district, local business district, commercial and light manufacturing districts, and industrial districts. The relator had applied for a permit to make an addition to his dairy and milk pasteurizing plant, which addition did not conform to the use permitted by the ordinance within that particular district. The Supreme Court of Wisconsin denied the writ of mandamus and held that the ordinance was a valid exercise of the police power, and not unreasonable because of the fact that it prohibits the enlarging of' an existing building in a residence district. The paragraphs of the syllabus in the
 
 Garter case
 
 which are in point in this case are as follows:
 

 “7.
 
 It is reasonable to attempt to preserve various sections of a city from intrusions on the part of institutions that are offensive to and out of harmony with the use to which such sections a.re devoted, and under present standards of society these unbecoming intrusions constitute such a recognized interference with the rights of residents as to justify regulation.
 

 “8. There are benefits to be derived by cities adopting zoning regulations, the attainment of which afford a legitimate exercise of the police power; and the results which such regulations tend
 
 *650
 
 to accomplish being material rather than aesthetic in their nature, it is unnecessary to consider how far aesthetic considerations furnish a justification for the exercise of the police power.”
 

 In the case of
 
 Ware
 
 v.
 
 City of Wichita,
 
 113 Kan., 153; 214 P., 99, the court held that a comprehensive zoning ordinance .which forbade the construction of a business building in a residential district was a valid exercise of the police power, and specifically decided that cities under the Kansas state and federal Constitutions have power to plan and create reasonable zoning districts for the future systematic development of the city, to provide therein for residential, commercial and industrial districts, and to prohibit the construction of buildings at variance with such plan of development.
 

 The Court of Appeals of New York state, in the case of
 
 Lincoln Trust Co., Trustee,
 
 v.
 
 Williams Bldg. Corp.,
 
 229 N. Y., 313, 128 N. E., 209, held as follows:
 

 “1. A resolution regulating and limiting the height and bulk of buildings hereafter erected, and regulating and determining the area of yards, courts, and other open spaces, and regulating and restricting the location of trades and industries, and the location of buildings designed for specified uses and establishing the boundaries of districts for the said purposes, adopted by the board of estimate and apportionment of the city of New York pursuant to the so-called zoning law (L., 1901, c. 466; L., 1914, o. 470; L,, 1916, o. 497), is a proper exercise of the police power, and does not constitute an incumbrance upon real property.”
 

 
 *651
 
 There are decisions of weight contra, snch as
 
 Goldman
 
 v.
 
 Crowther
 
 (Md.), 128 A., 50, but we prefer the reasoning of the majority opinions.
 

 Having decided that the ordinance has some reasonable relation to the public health, morals, and safety, we have next to inquire whether the classifications made therein are reasonable. In our view this question must be answered in the affirmative. Owing to the difference in construction and the difference in use in residence and business districts, respectively, it is reasonable to provide for more air space in the residence than in the business districts; it is reasonable, for the same reason, to provide for more drastic height, area, and bulk limitations in the residence than in the business and industrial districts.
 

 Since, as above stated, the building in question here will violate none of the use restrictions of the zoning ordinance, no question of the validity of specific use restrictions in Cincinnati not covered in this case are raised, and such questions are reserved for determination as cases which involve them arise.
 

 Having decided that the ordinance in question is in its general features constitutional, we have next to consider whether the defendant is precluded from erecting the apartment house in question because of the fact that the ordinance is valid. It is admitted that the building as planned contravenes the provisions of the zoning ordinance.
 

 In this case, however, a building permit was issued to the defendants prior to the passage of the zoning ordinance. It was claimed by the plaintiffs in their application for injunction that
 
 *652
 
 this building permit was invalid, upon the ground that the plans submitted upon application for the permit were incomplete and did not comply with the ordinances of Cincinnati in force at the time. The defendants denied this allegation, claiming that the plans and specifications upon which the building permit was based were in full compliance with the ordinances of the city of Cincinnati prior to the passage of the zoning ordinance. This denial was joined in by the building commissioner of Cincinnati in his answer, who specifically stated that the plans submitted were complete and in compliance with the ordinance of Cincinnati in force at the time of their submission.
 

 The Court of Appeals found generally noon the issues joined for the defendants. This finding of fact is sustained by ample evidence. Since it has been found as a fact that the permit was issued upon adequate plans, which complied with the law then in force, Ave have to inquire whether the building of the apartment house planned is validated by the exception made in the zoning ordinance, which reads as follows (Section 452-90):
 

 “
 
 Nothing herein contained shall require any change in the plan, construction, size or designated use of a building, for which a building permit has been issued before the passage of this ordinance, provided construction, under such permit, shall be started within six months and the ground story frame work including the second tier of beams shall have been completed within one year and the entire building completed -within two years after the date of such permit.”
 

 It is conceded that work under this permit was
 
 *653
 
 started within 6 months and that the entire excavation was completed within less than 6 months after the permit was granted.
 

 The Court of Appeals having found as. a fact that a valid building permit was issued before the passage of the ordinance, and the zoning ordinance itself containing a specific exception within which this case falls, the constitutionality of the ordinance does not entitle the plaintiff in error to relief, and the judgment of the Court of Appeals must be affirmed.
 

 Judgment
 
 affirmed„
 

 Marshall, C. J., Day and Kinkade, JJ., concur.
 

 Jones, Matthias and Robinson, JJ., concur in the judgment.